UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------
DAVID JONES,

                                Petitioner,

           vs.                                        9:08-CV-1310
                                                       (TJM)(ATB)

WILLIAM LAPE, Superintendent,

                             Respondent.
-------------------------------------------------------------------------
DAVID JONES, Petitioner, *pro se*
ALYSON J. GILL and LEILANI RODRIGUES, AAGs, for Respondent

ANDREW T. BAXTER, United States Magistrate Judge

## REPORT-RECOMMENDATION

This matter was referred for Report and Recommendation by the Honorable Thomas J. McAvoy, Senior United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c).  The case was re-assigned to me on January 4, 2010, following the retirement of Magistrate Judge Gustave J. Di Bianco.

Petitioner brings this action for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging a judgment of conviction from the Oneida County Court.  On March 10, 2004, petitioner was convicted, following a jury trial, of Attempted Rape in the First Degree (N.Y. PENAL LAW § 110/130.35(1)), Attempted Sexual Abuse in the First Degree (N.Y. PENAL LAW § 110/130.65(1)), and Endangering the Welfare of a Child (N.Y. PENAL LAW § 260.10(1)).  Petitioner was sentenced on April 23, 2004 to serve a determinate 15-year term of imprisonment and a five-year term of post-release supervision on the Attempted Rape charge.

Petitioner appealed his conviction and sentence.  On March 17, 2006, the

Appellate Division, Third Department, modified petitioner's sentence on one of the lesser charges, but otherwise affirmed petitioner's judgment of conviction. *People v. Jones*, 27 A.D.3d 1161, 810 N.Y.S.2d 757 (4th Dept. 2006). On September 29, 2006, the New York Court of Appeals denied leave to appeal. *People v. Jones*, 7 N.Y.3d 849, 823 N.Y.S.2d 778 (N.Y. 2006) (table).

On September 27, 2007, petitioner filed a *pro se* motion to set aside his sentence pursuant to N.Y. CRIM. PROC. LAW §§ 440.10(1)(h) and 440.30, which was denied by an Oneida County Acting Supreme Court Judge on November 5, 2007. (State Court Record, Exs. G & I, Dkt. Nos. 12-7 & 12-9).[1] Petitioner sought leave to appeal this decision from the Appellate Division on May 2, 2008, which was denied on September 18, 2008. (Exs. J & K, Dkt. Nos. 12-10 & 12-11).

The petitioner is presently incarcerated in Coxsackie Correctional Facility in Coxsackie, New York, serving his sentence. His earliest release date is June 27, 2016. His maximum expiration date is August 19, 2018. (Petitioner's State Appellate Brief, Ex. B (under seal), at 14).

In support of his petition, David Jones alleges that his trial counsel and appellate counsel provided ineffective assistance and that the imposition of post-release supervision was illegal and unconstitutional. (Dkt. No. 1). Respondent has filed an answer (Dkt. No. 10), a memorandum of law (Dkt. No. 11), and the pertinent

---

[1] Subsequent references to the State Court Record will be solely to the exhibit and docket numbers. Petitioner's state court appellate brief, as well as pretrial hearing and trial transcript, have been filed under seal because they make frequent references to the names of minor children and other personal identifying information.

state court records.  (Dkt. No. 12).  Respondent argues that petitioner failed to exhaust

his administrative remedies and that his claims should be denied because they are

completely without merit.  Petitioner filed a traverse.  (Dkt. No. 13).  For the reasons

set forth below, this court will recommend denial of the petition.

## DISCUSSION

I.    **Facts and Procedural History**

  A.    **Factual Overview**

Petitioner lived on a dairy farm in Oneida County, New York, with his wife, CJ[2]

and four children.  When petitioner's oldest daughter ("D1") was around ten or eleven

years old, her father would ask her for "big hugs," which consisted of D1 laying

on top of petitioner and rubbing herself against his genitals.  As time progressed,

petitioner and D1 would wear only their underwear during "big hugs," and

eventually they were both completely naked.  On one occasion, petitioner touched

D1's vagina with his finger.

On August 18, 2003, when she was sixteen years old, D1 and her younger sister

("D2") drove to an amusement park and did not return home until after 9:00 p.m.

Their mother was working a night shift, and they observed their father in the barn.

Instead of helping with chores, the girls went to bed.  At approximately 4:30 a.m. the

next morning, petitioner entered D1's bedroom and began yelling at her for not

helping in the barn the previous night.  Petitioner then started kissing D1 on the cheek.

---

[2] The court will refer to other members of petitioner's family with initials and will withhold
other identifying information in an effort to protect the identity of the victim of sexual abuse and
other minor children.

D1 rolled off of the bed and onto the floor, landing on her back.  Petitioner straddled D1 by sitting on her stomach, held her down with one forearm, and pulled her underwear down to her ankles with his other hand.  D1 became afraid and yelled for her brother and sister's help and screamed "Dad, stop."  D2 came to her sister's bedroom and petitioner jumped off of D1.

Several days later, D1 told her mother about the incident on August 18th and the prior sexual contact with the petitioner.  On August 23, 2003, CJ took D1 to the local Sheriff's Department, where they met with a child abuse investigator, Richard Ferrucci.  Investigator Ferrucci recorded a telephone conversation between petitioner and D1, with her consent.  Petitioner was arrested shortly thereafter, and made numerous inculpatory admissions to law enforcement personnel.

On October 1, 2003, an Oneida County grand jury charged petitioner with Attempted Rape in the First Degree, Attempted Sexual Abuse in the First Degree, and Endangering the Welfare of a Child.  All of the charges related to the incident of August 18, 2003.

### A.    The *Huntley* Hearing

Petitioner's trial attorney, from the Oneida County Public Defender's Office, moved to suppress petitioner's statements, made during the recorded telephone conversation with his daughter and in response to a post-arrest interview by Inv. Ferrucci.  On December 18, 2003, a "*Huntley*"[3] hearing was conducted before an Oneida County Court judge to determine the admissibility of petitioner's statements,

---

[3] *People v. Huntley*, 15 N.Y.2d 72, 255 N.Y.S.2d 838 (N.Y. 1965).

both on the telephone and to Inv. Ferrucci.

During the *Huntley* hearing on August 23, 2003, Inv. Ferrucci testified that he took a statement from petitioner's two daughters, documenting the incident that had occurred the previous Friday, as well as the earlier sexual contact between D1 and her father.  (Hearing Transcript, 12/18/03 ("HT") at 6-7).  He then asked D1 if she would make a recorded telephone call to her father, which she agreed to do so.  Inv. Ferrucci presented a document entitled "Authorization to intercept communication" to D1, which she signed after it was read to her.  (HT at 8-9; Trial Transcript ("TT.") at 318-319).

D1 made a telephone call to her father at 2:37 a.m., which was recorded with her knowledge and consent.  (HT at 9-11; TT. at 334).  In the call, D1 told her father that she was scared and that she was thinking of telling her mother about what had happened.  D1 told the petitioner that he had tried to "rape" her.  Petitioner replied that he was sorry, that he never meant to hurt her, and that he would never hurt her again. (HT at 13-15).

As soon as the call was completed, CJ, escorted by several Sheriff's deputies, entered petitioner's house.  Inv. Ferrucci instructed the deputies to ask the petitioner if he would be willing to go to the Sheriff's Department to talk to the officers; if he refused, the deputies were instructed to arrest him.  (HT. at 15; TT. at 333).  The petitioner agreed to go to the Sheriffs Department and was transported there at about 3:00 a.m.  (HT at 15-16; TT. at 334).

Inv. Ferrucci met the petitioner and took him to an interview room.  (HT. at 16;

5

TT. at 334).  After obtaining petitioner's pedigree information, Inv. Ferrucci asked

him, "David, do you understand why you're here?"  According to Ferrucci, the

petitioner answered, "Because I molested my daughter." (HT. at 16-17).  At that point,

at 3:08 a.m., Inv. Ferrucci took out a Miranda waiver form and advised the petitioner

of his rights.  (HT at 17-19; TT. at 335-339).

Inv. Ferrucci said that when the petitioner was with him, he was not in

handcuffs, although the petitioner knew that he would not be going home that night.

(TT. at 341).  Inv. Ferrucci testified that the petitioner was "definitely in custody"

while he was at the Law Enforcement Building.  (TT. at 341).

Inv. Ferrucci testified that the petitioner did not look fatigued, and denied that

he had been drinking or taking any drugs.  (HT at 26-27; TT. at 342).  The petitioner

testified, at his trial, that he had taken a muscle relaxer called Flexeril that evening and

was very tired and groggy during his interview.  (TT. at 386-391).

After the petitioner signed the Miranda waiver form, Inv. Ferrucci started to

interview him about the incidents of sexual and physical contact with his daughter.

The officer told the petitioner that he had heard the recorded telephone conversation

and that he had talked to D1 about what had happened between them.  According to

Ferrucci, the petitioner immediately began making admissions.  (TT. at 346-347).

Ferrucci said that he then asked the petitioner if he would give a written

statement to him and the petitioner agreed to do so.  (HT at 20-22; TT. at 347).  An

officer of the Department of Social Services entered the interview room and remained

there while petitioner's written statement was prepared.  (HT at 21; TT. at 348-349).

Inv. Ferrucci prepared a two page written statement, which he reviewed with the petitioner and edited, as the petitioner directed.  (HT at 24-25; TT. at 351-352).  The petitioner then signed the statement at 4:05 a.m.  (TT. at 355).

Following the *Huntley* hearing, the court found that petitioner voluntarily accompanied the sheriff's deputies to the Sheriff's Department. The court held that petitioner was not in custody when he received the telephone call from his daughter or when he was first questioned by Inv. Ferrucci. The court found that immediately upon petitioner's statement that he was there because he molested his daughter, Inv. Ferrucci read petitioner his Miranda warnings and petitioner waived them freely, knowingly, and voluntarily. Thus, the court held that petitioner's statements in the telephone call and to Inv. Ferrucci were not the result of any violation of petitioner's constitutional rights, and were admissible at trial.  (Exhibit A at 5-6, Dkt. No. 12-1). In making these ruling, the court noted that he found the testimony of Inv. Ferrucci truthful and the testimony of the petitioner "largely incredible."  (*Id.*  at 2).

## B.    The *Sandoval-Ventimiglia* Hearing

Although the charges against the petitioner all involved the incident of August 15, 2003, the prosecutor sought to introduce evidence of the petitioner's prior sexual contact with D1–the "big hugs."  Just prior to the start of trial, the court held a *Sandoval-Ventimiglia*[4] hearing.  (TT. at 8).  The prosecutor argued that these prior

---

[4] In a *Sandoval* hearing, the court determines the admissibility of prior crimes for impeachment purposes, should the defendant take the stand.  *People v. Sandoval*, 34 N.Y.2d 371, 357 N.Y.S.2d 849 (N.Y. 1974).  In a *Ventimiglia* hearing, the court assesses the probative force and prejudicial effect of any evidence of uncharged crimes or prior bad acts to be offered at trial.  *People v. Ventimiglia*, 52 N.Y.2d 350, 438 N.Y.S.2d 261 (N.Y. 1981).

uncharged crimes were probative of the petitioner's sexual intent with respect to the charged offenses.  (TT. at 9).

Defense counsel objected on the ground that the prosecution did not need this additional proof to establish the petitioner's intent in this case.  (TT. at 9-10).  He further argued that the People had D1's testimony, as well as the petitioner's statement to establish the requisite state of mind.  (TT. at 10-11).  Counsel argued that the prejudicial impact of these prior uncharged crimes would outweigh any probative value that they would have.  (TT at 10).

The trial judge ruled that he would allow the prosecutor to present evidence of these uncharged crimes in her direct case because the probative value of the evidence outweighed the prejudice that it would cause the petitioner.  (TT. at 12).  The court held that these uncharged crimes could be proven by the prosecutor through the testimony of D1 and through the oral and written statements made by the petitioner to Inv. Ferrucci.  (TT. at 12).  The Court further held that it would give limiting instructions regarding this evidence.  (TT. at 12).

### C.    The Trial

Petitioner's jury trial was conducted from March 8th to 10th, 2004 before an Oneida County Court Judge.

#### 1.    The People's Case

##### a.    Petitioners's Prior Sexual Contact With His Daughter

Petitioner's wife ("CJ") was a registered nurse.  For a period of time, she worked the night shift at a hospital for five days every two weeks.  (TT. at 279).

8

The victim in this case, D1, testified at the trial that, after her mother would leave for work at night, her father, the petitioner, would sometimes come into the bedroom that she shared with her younger sister ("D2") and would ask D1 to give him "big hugs" (TT. at 185) in his bedroom. (TT. at 186).

At first, D1 said, the petitioner would lay on his back and, with both of them still wearing all of their clothes. He would have D1 lay on top of him and move up and down on his body. (TT. at 186-187). Later, D1 testified, both would take their outer clothes off and wear only their underwear. D1 said that she would then get on top of him and move up and down on his body. (TT. at 187-188). Eventually, D1 testified, she and her father both took all of their clothes off and she would get on top of him, face to face. (TT. at 189-190). She said that during this time, the petitioner would touch her vagina with his finger. (TT. at 190). In about the year 2000, when CJ stopped working the night shift, the petitioner stopped asking D1 for "big hugs." (TT. at 191).

### b.    The Incident in August 2003

Sometime around Friday, August 15, 2003, D1 and D2 went for an outing at the Enchanted Forest Amusement Park in Old Forge, New York. By that time, D1 was sixteen years old and had her driver's license. (TT. at 191). The girls returned home to the farm at about 9:15 p.m. Their mother was away at her job, and the petitioner and one son were working in the barn. (TT. at 192-93). Instead of going into the barn to help their father and brother do the chores, D1 and D2 went into the house and went to bed. (TT. at 193). By then, they each had their own bedrooms upstairs, while their

parents' bedroom was downstairs.  (TT. at 194).  When D1 went to bed, she was

wearing a pair of boxer-like underwear and a T-shirt and bra.  (TT. at 195).

At 4:30 a.m., D1 said that she woke up when her father opened her door.  She

said that it was not unusual for him to wake her up at 4:30 a.m. to help milk the cows.

She also said that her father was wearing his undershorts at the time, but that he would

always wear his undershorts when he woke her up to do the chores because his barn

clothes were kept on the back porch.  (TT. at 221).

D1 testified that her father was very upset because she had not gone out to the

barn the prior evening to help with the chores.  He raised his voice to her, and then,

came over and started kissing her on the cheek.  (TT. at 196-197).  D1 said that she

immediately pushed herself away from him and in doing so, rolled off the bed and fell

on the floor onto her back.  (TT. at 197).  The petitioner also ended up on the floor,

straddling D1 with his legs.  (TT. at 198).  D1 testified that she became scared that her

father would hurt her, so she called out to D2 and her brother, who were both in the

house at that time.  (TT. at 199).  She yelled, "Dad, stop.  You're hurting me."  (TT. at

232).

D1 testified that the petitioner held her down with one arm across her chest and

used his other hand to pull down her underwear down to her ankles.  (TT. at 199-200).

She said that as he did so, he asked her "why she had screwed him over last night."

(TT. at 202).  D1 said that she tried to push him off of her, but that she was not able to

lift up her body.  (TT. at 200-201).

In the meantime, D2, then thirteen years old, said that she heard her sister

10

calling for help and yelling "Dad, stop."  (TT. at 252).  At that point, she said, she

went into her brother's room and told him that something was the matter with D1.

The brother replied that "Dad was just tickling her."  (TT. at 253).

D2 then went to D1's room and saw D1 on the floor, with their father straddling

her.  She said that she yelled, "Dad, what are you doing?"  At that point, the petitioner

stood up and came toward D2.  (TT. at 254-255).  Her father, who seemed to be angry,

backed D2 up against a wall, without touching her.  (TT. at 259).  The petitioner then

left the room and went downstairs.  (TT. at 260).  According to D1, the petitioner

asked D2 why she had "screwed him over last night."   (TT. at 201).

D2 testified that when she went over to talk to D1, D1's face was red and she

was crying.  (TT. at 261).  They both then got dressed and went out to the barn to help

their father.  (TT. at 203).  As they were all milking the cows, D1 said that she told her

father that he had tried to hurt her, and that they needed to tell her mother.  (TT. at

204).  D1 testified that the petitioner warned her that, if she told her mother about the

incident, her mother would seek a divorce, and D1 would not have a dad to walk her

down the aisle.  (TT. at 205).

D1 told the petitioner that she wanted to talk to her mother because she did not

know if he would physically harm her.  (TT. at 223).  She said that, a few weeks

before this incident, she had gotten into an argument with her father out in the barn.

During the argument, she had thrown something at the petitioner and he had come

over to her and "twisted" her stomach.  (TT. at 223).  D1 testified that she did not

know what that morning's incident meant, and she wanted her mother to straighten

things out with him.  (TT. at 223-224).  D1 said that, although she believed that it was possible that her father had attempted to rape her that night, she had not really thought of that until the police officer suggested that to her.  (TT. at 234).

### c.    The Disclosure of the Incident to the Victim's Mother

On Wednesday, August 20, 2003, D1's mother (CJ) took her two daughters on a trip to Buffalo to visit her parents at their summer home.  (TT. at 281).  CJ testified that she got into an argument with D1 during the car ride home on Saturday, August 23, 2003.  D1 told her mother that she no longer wanted to live at home, and that she wanted to move out.  (TT. at 298).  During the argument, D1 began making allegations of a sexual nature against the petitioner.  (TT. at 285-286).  D1 said that she finally told her mother about the incident that had happened the Friday before and the sexual contact that had occurred several years earlier.  (TT. at 206-07).

CJ testified that she immediately went into a state of panic.  (TT. at 286).  She called her parents and, at their suggestion, immediately called the child abuse hotline. The counselor who spoke to CJ told her to report to the nearest police station in her own county.  CJ said that she continued to drive until she reached the Oneida County Sheriff's Department in Oriskany.  (TT. at 286-287).

### d.    Petitioner's Arrest and Confession

At the Sheriff's Department, Inv. Ferrucci of the Child Advocacy Center, interviewed D1 and D2 about the sexual abuse by petitioner.  (TT. at 316-317).  Then, Inv. Ferrucci asked D1 to call her father on the telephone so that they could tape record the conversation.  (TT. at 208-09, 318).  Before the call was made, the Sheriff's

deputies, accompanied by CJ, went to petitioner's home.  After the call was

completed, the sheriff's deputies and CJ entered the house, and CJ began to scream at

petitioner.  (TT. at 290-91).  Petitioner agreed to return to the Sheriff's Department,

where he was interviewed by Inv. Ferrucci.  (TT. at 333-34).

   During the trial, Inv. Ferrucci read petitioner's post-arrest statement to the jury.

(TT. at 363- 67).  Petitioner admitted that when D1 was about ten years old, he would

ask her for a "big hug" and would have her lay on top of him and "move around on my

penis area with her kitty."  (TT. at 363).  He then stated that when he started this

behavior, he and D1 were fully clothed.  Eventually, they wore just underwear; and

finally, they were fully naked.  (TT. at 363-64).  Petitioner admitted that he "would

rub her private area" and would "put [his] fingers inside of her kitty, but not deep, just

inside the lips."  (TT. at 364).  Petitioner believed that D1 was thirteen when he started

touching her.  (TT. at 364).  When they were naked and rubbing their bodies,

petitioner would ejaculate in his hand or on the bed.  (TT. at 364).  He admitted that it

excited him to be with D1, even though he knew it was wrong. This activity occurred

about once a month.  (TT. at  364).

   Petitioner further admitted that, the prior week, he "lost control again" and went

into D1's room at around five o'clock in the morning and asked for a big hug. When

D1 refused, petitioner became aggressive and ended up on top of her on the floor.  He

admitted that he pulled her underwear down to her ankles and that he tried to pull her

shirt up.  (TT. at 365).  At that point, D2 walked in and petitioner felt sick because he

realized "that [he] was trying to have sex with [his] daughter and [his] other daughter

13

walked in and caught [him]."  (TT. at 365).  Petitioner stated that he was sure that if

D2 had not walked in, he "would either had sex with [her] or [he] would have just

touched her kitty."  (TT. at 366).

>           2.      **Petitioner's Case**

Petitioner testified that on the night of the incident in August of 2003, he went

into D1's room to wake her up so she could do her chores.  (TT. at 378).  He stated that

he gave her a kiss on the cheek and asked her to wake up. When she resisted, he began

to tickle her hips.  (TT. at 379-81).  According to petitioner, she then fell down on the

floor and he landed on top of her.  D1 began to scream for her brother and sister as

petitioner tried to get up.  (TT. at 379-81).  Petitioner denied pulling down his

daughter's panties or having any sexual intentions with respect to her that evening.

(TT. at 385, 442-443).

Petitioner further testified that, when D1 called him on the telephone, he

thought she was talking about the incident a few days before, when he had twisted her

stomach after she had thrown something at him.  (TT. at 384-385).  With regard to the

statement allegedly given to the officer, the petitioner said that he did not remember

signing the *Miranda* waiver or the statement.  (TT. at 392, 395).  Petitioner testified

that, in the week before his arrest, he was very busy on the farm and had only been

sleeping a couple of hours a night.  When the police arrived at his house he was

groggy, in part because he took a muscle relaxant.  (TT. at 386-89, 391).  Petitioner

claimed that, because of his fatigue and the effect of taking a medication, his entire

encounter with Inv. Ferrucci was a "fuzz."  (TT. at 390-391).  He asserted that much

of what was attributed to him in his statement was not the truth.  (TT. at 431-432).

On cross-examination, the petitioner acknowledged having had sexual encounters with D1 when she was younger.[5]  He claimed that this conduct had lasted for a very short time, about two to three months.  He also admitted that on one occasion, he had touched her vagina with his hands.  Petitioner testified that he had sought help for this behavior and had received it.  As a result, he said, he never repeated the sexual contact with D1.  (TT. at 414-416).

### G.    The Verdict and Sentencing

At the close of the trial, the trial judge instructed the jury with respect to the three counts of the Indictment.  The court also instructed the jury that it was only to consider the prior uncharged crimes to determine the petitioner's intent in regard to the offenses with which he had been charged.[6]  (TT. at 515).  On March 10, 2004, the jury found the petitioner guilty of all three Counts in the Indictment.  (TT. at 542-43).

On April 23, 2004, the Oneida County Court Judge sentenced the petitioner as a first felony offender.  As a result of his conviction for Attempted Rape in the first degree, the Court sentenced petitioner to a determinate term of imprisonment of fifteen years, plus five years of post-release supervision.  On the conviction for

---

[5] Defense counsel objected to the questioning of the petitioner about those prior uncharged crimes, because he would be compelled to invoke his Fifth Amendment rights with regard to those accusations.  However, the prosecutor indicated that the People would not seek to prosecute petitioner for the prior sexual contact with his daughter at any time in the future.  (TT. at 375- 76).  As a result of that grant of immunity, the prosecution was allowed to cross- examine the petitioner about the prior uncharged sexual contact with D1.  (TT. at 414- 15).

[6] The trial judge gave similar limiting instructions at several points during the trial when petitioner's uncharged sexual contact with D1 was presented.  (TT. at 245, 372-73).

Attempted Sexual Abuse in the first degree, the court sentenced him to a determinate term of imprisonment of four years, plus three years of post-release supervision. Finally, on the conviction for Endangering the Welfare of a Child, the court sentenced petitioner to a definite sentence of one year in jail. The Court also ordered that all of these sentences were to run concurrently. (Sentencing Transcript "ST," 4/23/04, at 13-14).

### H.   Petitioner's Direct Appeal

Petitioner's direct appeal was handled by an attorney from the Oneida Public Defender's Office other than his trial counsel. Although appellate counsel's brief extensively discussed petitioner's post-arrest statement, counsel challenged petitioner's conviction and sentencing by arguing that: (1) the court abused its discretion in allowing the prosecution to introduce evidence of the uncharged sexual contact between petitioner and his daughter several years before the charged crimes; (2) the court improperly sentenced petitioner to a determinate, rather than indeterminate prison term for the attempted sexual abuse conviction; and (3) the sentence was harsh and severe, and should be reduced. (Ex. B).

The District Attorney's Office acknowledged that petitioner was unlawfully sentenced on the sexual abuse charge and conceded that petitioner should be re-sentenced on that count, but otherwise defended the conviction and sentence. (Ex. C, Dkt. No. 12-3). In a decision dated March 17, 2006, the Appellate Division, Fourth Department, vacated petitioner's sentence for the attempted sexual abuse count and remanded the case to the trial court for re-sentencing. The court otherwise affirmed

petitioner's conviction.  *People v. Jones*, 27 A.D.3d 1161, 810 N.Y.S.2d 757 (4ᵗʰ Dept. 2006).  (Ex. D, Dkt. No. 12-4).[7]

Petitioner's attorney sought leave to appeal the Appellate Division's decision to the New York Court of Appeals. (Exhibit E, Dkt. No. 12-5).  In a decision dated September 29, 2006, a judge of the Court of Appeals denied petitioner's application. *People v. Jones*, 7 N.Y.3d 849, 823 N.Y.S.2d 778 (N.Y. 2006) (table).  (Exhibit F, Dkt. No. 12-6).

## I.    Petitioner's Motion to Vacate the Judgment

On September 27, 2007, the petitioner filed a *pro se* motion to set aside his sentence pursuant to N.Y. CRIM. PROC. LAW §§ 440.10(1)(h) and 440.30. (Ex. G, Dkt. No. 12-7).  Petitioner claimed that his sentence improperly included post-release supervision and claimed that his appellate counsel provided ineffective assistance by not raising that issue on appeal.  On November 5, 2007, the court denied petitioner's motion to vacate the judgment.  (Exhibit I, Dkt. No. 12-9).  The court held that petitioner's claims were procedurally barred pursuant to N.Y. CRIM. PROC. LAW § 440.10(2)(c) because petitioner could have raised these claims in his Appellate Division brief, but unjustifiably failed to do so.

---

[7] The Appellate Division rejected petitioner's claim that the trial court erred in allowing the prosecution to introduce evidence of prior sexual contact between petitioner and the victim. The court explained that "a central issue before the jury was whether [petitioner] intended to rape the victim, and thus evidence of prior uncharged crimes concerning sexual contact with the victim was properly admitted." (*Id.*)

## II.    Discussion

### A.    Applicable Law

#### 1.    The AEDPA

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) provides that a federal court lacks the power to grant a writ of habeas corpus under 28 U.S.C. § 2254 unless the state court ruling *on the merits* of a federal constitutional issue was either "'contrary to . . . clearly established Federal law' or 'involved an unreasonable application . . . of clearly established Federal law.'"  *Noble v. Kelly*, 246 F.3d 93, 98 (2d Cir. 2001) (quoting 28 U.S.C. § 2254(d)(1)) (alterations in original).[8]  In order to apply this standard under the AEDPA , the petitioner's claim must have been "adjudicated on the merits" in the state court proceedings.  28 U.S.C. § 2254(d)(1).  *See also Day v. Taylor*, 459 F. Supp. 2d 252, 256 (S.D.N.Y. 2006) (a federal court's ability to review a habeas petition depends on whether the state court adjudicated the petitioner's claims on the merits or on procedural grounds).

Under the AEDPA, a state court's factual findings are presumed correct, unless that presumption is rebutted by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).  If the state court failed to decide a claim "on the merits," the pre-AEDPA standard of review applies, and both questions of law and mixed questions of law and fact are reviewed *de novo*.  *Washington v. Shriver*, 255 F.3d 45, 55 (2d Cir. 2001).

---

[8] Prior to the AEDPA, the court was not required to defer to state court determinations on pure questions of law and mixed questions of law and fact. *Thompson v. Keohane*, 516 U.S. 99, 107-113 (1995).  When presented with these questions, the court was empowered to conduct an independent review of the record.  *Id.*

### 2.    Exhaustion

"Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, . . . thereby giving the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (citing *Duncan v. Henry*, 513 U.S. 364, 365, (1995) (internal quotation and other citations omitted); 28 U.S.C. § 2254(b)(1). The prisoner must "fairly present" his claim in each appropriate state court, including the highest court with powers of discretionary review, thereby alerting that court to the federal nature of the claim. *Id.*; *Bossett v. Walker*, 41 F.3d 825, 828 (2d Cir. 1994).

### 3.    Procedural Bar

If petitioner has failed to exhaust his state court remedies, but no longer has remedies available in state court, then the claims are "deemed" exhausted, but may also be barred by procedural default. *Bossett v. Walker*, 41 F.3d at 828 (citing *Grey v. Hoke*, 933 F.2d 117, 120-121 (2d Cir. 1991)). A state prisoner who has procedurally defaulted on a federal claim in state court may only obtain federal habeas review of that claim if he can show both cause for the default and actual prejudice resulting from the alleged violation of federal law, or if he can show that he is "actually innocent." *Clark v. Perez*, 510 F.3d 382, 393 (2d Cir. 2008) (internal quotation and citations omitted). "Cause" exists if "the prisoner can show that some objective factor external to the defense impeded counsel's effort to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Prejudice exists if there is a "reasonable probability" that the result of the proceeding would have been different absent the

alleged constitutional violation.  *Stickler v. Greene*, 527 U.S. 263, 289 (1999).

### 4.    Reaching the Merits of Unexhausted Claims

The habeas statute provides that a petition may be denied on the merits, notwithstanding the failure to exhaust state court remedies, assuming there is no procedural bar.  28 U.S.C. § 2254(b)(2).  In the absence of specific guidance from the Second Circuit, lower courts in this circuit have applied two standards to determine whether a claim should be dismissed on the merits, notwithstanding the failure to exhaust.  *See Hernandez v. Conway*, 485 F. Supp. 2d 266, 273 n.1 (W.D.N.Y. 2007).  A majority of lower courts use a "patently frivolous" standard, while others use a "non-meritorious" standard, dismissing a claim when it is "perfectly clear that the [petitioner] does not raise even a colorable federal claim."  *Id.* (collecting cases).[9]

### 5.    Ineffective Assistance of Counsel

The general standard for ineffective assistance of counsel, which applies to both trial and appellate counsel, was articulated by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687-696 (1984); *McKee v. United States*, 167 F.3d 103, 106 (2d Cir.1999) (*Strickland* standard also applies to effectiveness of appellate counsel).  This test requires an affirmative showing that counsel's performance fell below an objective standard of reasonableness, and that prejudice resulted because

---

[9] In finding that a "non-meritorious" standard was more appropriate, one court referenced Justice Steven's concurrence in the Supreme Court decision in *Duncan v. Walker*.  *Basnight v. Keane*, No. 99-CV-5907, 2001 WL 901139, at *5 n. 1 (E.D.N.Y. July 31, 2001).  In Duncan, Justice Stevens stated that "the AEDPA gives a district court the alternative of simply denying a petition containing unexhausted but nonmeritorious claims."  *Duncan v. Walker*, 533 U.S. 167, 183 (2001) (emphasis added).

there was a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 688, 694.

When assessing counsel's performance, courts "'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Jackson v. Leonardo*, 162 F.3d 81, 85 (2d Cir.1998) (quoting *Strickland*, 466 U.S. at 689). Courts should not use hindsight to second-guess sound tactical decisions made by attorneys. *McKee v. United States*, 167 F.3d at 106 (citing *Strickland*, 466 U.S. at 689).

In evaluating the prejudice component of *Strickland*, a "reasonable probability" that the outcome of the proceeding would have been different means "a probability sufficient to undermine confidence in the outcome." *Strickland* 466 U.S. at 694, Unlike the performance determination, the prejudice analysis may be made with the benefit of hindsight. *McKee v. United States*, 167 F.3d at 106-107 (citing, *inter alia*, *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993)). *See also Mickens v. Taylor*, 535 U.S. 162, 166 (2002) (explaining the limited exceptions to general rule requiring showing of prejudice).

### B.   Application

#### 1.   Claim of Ineffective Assistance of Trial Counsel

Petitioner claims that his trial counsel was ineffective in that he "did not present a defense in this case and did not challenge both the phone call from my daughter while I was in custody . . . and did nothing to challenge prior alleged bad acts and allowing me to be put on the stand to testify knowing that was an issue." (Pet., Dkt.

No. 1 at 4).

### a.    Exhaustion

The claims that trial counsel was ineffective were raised, for the first time, in

this habeas petition.  Petitioner clearly failed to exhaust these claims by not raising

them in his state court direct appeal or in his post-conviction motion.  *See, e.g.,*

*Caballero v. Keane*, 42 F.3d 738, 740-741 (2d Cir. 1994) (aspect of ineffective

assistance claim regarding trial counsel that was never presented in a New York court

was unexhausted); *Rodriguez v. Hoke*, 928 F.2d 534, 538 (2d Cir. 1991) (finding that

petitioner failed to exhaust claims of ineffective assistance of trial counsel on various

grounds never raised before a state court).

### b.    Procedural Bar

If petitioner attempted now to exhaust these claims by filing another motion to

vacate under  N.Y. CRIM. PROC. LAW § 440.10, his motion would likely be subject to

mandatory dismissal under § 440.10(2)(c) for unjustified failure to raise the particular

instances of alleged ineffective assistance on direct appeal.[10]   ""[A] federal habeas

court need not require that a federal claim be presented to the state court if it is clear

---

[10] A second § 440.10 motion would also be subject to discretionary denial under § 440.10(3)(c) because petitioner failed to raise the claim of ineffective assistance of trial counsel in his first motion to vacate in state court.  Because the denial of a second motion under §440.10 (3)(c) is not mandatory, this would not require a finding of procedural default.  *See, e.g.*, *Affser v. Murray*, 04 CV 2715, 2008 WL 2909367, at *4 (E.D.N.Y. July 28, 2008) (because a state court could, in its discretion, review claims on the merits under § 440.10(3)(c), despite petitioner's failure to raise them in his previous motions to vacate, these claims are not necessarily defaulted); *Perez v. Perrott*, 9:04-CV-327, 2008 WL 2323360, at *7 (N.D.N.Y. June 2, 2008) (same ruling with respect to discretionary grounds for denial of motion to vacate under § 440.10(3)(b)) (distinguishing *Murden v. Artuz*, 497 F.3d 178, 193 (2d Cir. 2007), *cert. denied sub nom. Murden v. Ercole*, 552 U.S. 1150 (2008)).

that the state court would hold the claim procedurally barred.'" *Grey v. Hoke*, 933 F.2d at 120 (quoting *Harris v. Reed*, 489 U.S. 255, 263 n.9 (1989)).

A state procedural bar forecloses federal habeas review only when it constitutes both an "independent" and "adequate" state law ground for deciding the claim. *Louis v. Fischer*, 04 Civ. 2887, 2007 WL 4198255 at *20 (S.D.N.Y. June 25, 2007) (citing *Cotto v. Herbert*, 331 F.3d 217, 238 (2d Cir. 2003)). In determining whether a state court's reliance on § 440.10(2)(c) would be "adequate" to support the denial of a § 440.10 motion, the court must examine if the rule is firmly established and regularly followed by the state in question. *Id.* (citing *Garcia v. Lewis*, 188 F.3d 71, 77-78 (2d Cir.1999)) (internal quotation and other citations omitted).

Under New York law, "it is well-settled . . . that where the record is sufficient to allow appellate review of a claim, the failure to raise that claim on direct appeal precludes subsequent collateral review of that claim." *Louis v. Fischer*, 2007 WL 4198255 at *21 (citing *Serrano v. Senkowski*, 02 Civ. 8708,  2004 U.S. Dist. LEXIS 18936 at *35-36 (S.D.N.Y. Sept. 23, 2004) (citing New York state cases)); *Brown v. Perlman*, 07 Civ. 8672, 2008 WL 2009220, at *28 n.56 (collecting cases) (S.D.N.Y. May 8, 2008). This rule applies to bar collateral review where the facts underlying an ineffective assistance of counsel claim appear on the record. *Id.* Accordingly, where an ineffective assistance of counsel claim is record-based, federal habeas courts have found N.Y. CRIM. PROC. LAW § 440.10(2)(c) to be "firmly established and regularly followed," and thus "adequate." *See, e.g., Sweet v. Bennett*, 353 F.3d 135, 139-40 (2d Cir.2003); *Alston v. Donnelly*, 461 F. Supp. 2d 112, 123-24 (W.D.N.Y. 2006); *Powers*

23

*v. Lord*, 462 F. Supp. 2d 371, 378 (W.D.N.Y. 2006). By contrast, where the ineffective assistance of counsel claim is not record-based, federal habeas courts have held that the rule of § 440.10(2)(c) is not adequate. *Louis v. Fischer*, 2007 WL 4198255 at *21 (internal quotation and citations omitted); *Murden v. Artuz*, 497 F.3d at 196. *See also* Holland v. Irvin, 45 Fed. Appx. 17, 20 (2d Cir. 2002) ("where, as here, the facts underlying the defendant's ineffective assistance claim are on the record and defendant has different counsel on appeal, New York courts require the defendant to make his ineffective assistance claim on appeal) (citations omitted).

Petitioner claims that his trial counsel was ineffective on grounds that, if meritorious, would clearly have appeared in the trial record. Whether or not counsel presented a defense–and he clearly did–would have been apparent from the trial transcript. The claim that counsel failed to challenge the People's use of the consensually recorded conversation between petitioner and his daughter is belied by the transcript of the *Huntley* hearing reflecting counsel's efforts to suppress both the recorded conversation and petitioner's confession. Similarly, the trial transcript reflects that trial counsel did attempt to bar the prosecutor from using evidence of petitioner's prior sexual abuse of his daughter in the *Sandoval-Ventimiglia* hearing at the start of the trial. As discussed below, the trial transcript also clearly demonstrates that trial counsel advised the petitioner, that if he took the stand in his own defense, he would be subject to cross examination regarding the prior, uncharged, sexual abuse. (TT. at 375- 76).

Because any basis for petitioner's belated claims of ineffective assistance of his

trial counsel would be contained in the trial record, he could have raised this issue on appeal.  Having failed to do so, he would be barred by procedural default under § 440.10(2)(c) from now raising those issues in a second § 440.10 motion. Accordingly, the court finds that these claims are procedurally barred.

To avoid denial of this habeas claim, petitioner would need to demonstrate cause and prejudice for failing to raise these claims at the appropriate time in state court or establish his "actual innocence."  Petitioner has offered no justification for his failure to raise the claims of ineffective assistance of trial counsel on direct appeal.[11] Given the strength of the evidence against him–including the testimony of his daughters, his confession (which was not mentioned in connection with petitioner's habeas claims of ineffective assistance), and the evidence of uncharged sexual abuse (which his trial lawyer did, in fact, attempt to exclude)–petitioner certainly has no plausible claim of prejudice, much less "actual innocence."  *See Murden v. Artuz*, 497 F.3d at 194 (to demonstrate "actual innocence," a habeas petitioner must show that it is more likely than not that no reasonable juror would have convicted him, but for the

---

[11] Although petitioner has raised a claim of ineffective assistance of his appellate counsel in his petition, he has never argued that appellate counsel was ineffective for failing to assert that trial counsel–a different lawyer– was ineffective.  In any event, as discussed below, petitioner has failed properly to exhaust, in state court, his claim that appellate counsel was ineffective.  Thus, any claim regarding his appellate counsel could not provide cause for his failure to raise any issue on appeal. *Taylor v. Poole*, No. 07 Civ. 6318, 2009 WL 2634724, at *16-17 (S.D.N.Y. August 27, 2009) (citing *Murray v. Carrier*, 477 U.S. 478, 489 (1986)) (because petitioner failed properly to present his ineffective assistance of appellate counsel "as an independent claim" in the state courts, it cannot serve as cause for his procedural default in failing to raise the issue of ineffective trial counsel on direct appeal); *Holland v. Irvin*, 45 Fed. Appx. at 19-20.

alleged constitutional violation); *Schlup v. Delo*, 513 U.S. 298, 327 (1995).[12]  A claim of actual innocence requires petitioner to put forth new reliable evidence that was not presented at trial, which petitioner has not done in this case.  *Cabezudo v. Fischer*, 05-CV-3168, 2009 WL 4723743, at *13 (E.D.N.Y. Dec. 1, 2009) (citing *Lucidore v. N.Y.S. Div. of Parole*, 209 F.3d 107, 114 (2d Cir. 2000)); *Schlup v. Delo*, 513 U.S. at 316, 327.  Accordingly, this court recommends denial of the habeas claim of ineffective assistance of his trial counsel as unexhausted, but procedurally defaulted.

Had petitioner been represented by the same attorney at trial and on appeal, the application of § 440.10(2)(c) to bar his claim of ineffective assistance of trial counsel might not be "adequate."  *See, e.g., Moseley v. Scully*, 908 F. Supp. 1120, 1128 (E.D.N.Y.1995), *aff'd*, 104 F.3d 356 (2d Cir.1996) (failure to raise an ineffective assistance claim on direct appeal would not bar a later § 440.10 motion when defendant was represented by the same counsel at trial and on direct appeal) (citing *People v. Harris*, 109 A.D.2d 351, 491 N.Y.S.2d 678 (2d Dept. 1985)); *Russillo v. Mellas*, 03-CV-792S, 2007 WL 748437, at *7 (W.D.N.Y. March 07, 2007) (§ 440.10(2)(c) has not been consistently applied where the petitioner retained the same trial and appellate counsel, and hence is not an adequate basis for a procedural bar).

The fact that petitioner's trial and appellate counsel were both lawyers from the

---

[12] Establishing "actual innocence" requires a stronger showing of prejudice than necessary to prevail on an ineffective assistance claim.  Actual innocence requires not legal innocence, but factual innocence.  *Id.* (internal quotations and citations omitted).

same public defenders' office does not, at least on the facts of this case,[13] undermine the adequacy of § 440.10(2)(c) as a procedural bar.  *See., e.g.*, *Torres v. Strack*, 96-CV-846, 1998 WL 59452, at *2, *5-7 (N.D.N.Y. Feb. 10, 1998) (although petitioner claimed that a conflict of interest on the part of appellate counsel caused her not to raise ineffective assistance of trial counsel, who was employed by the same public defenders' office, state court held that § 440.10 motion asserting ineffective assistance of trial counsel was procedurally barred by § 440.10(2)(c); habeas judge applied *Strickland* standards to determine appellate counsel was not ineffective in choosing issues to assert on appeal); *Garfield v. Poole*, 421 F. Supp. 2d 608, 613-614 (W.D.N.Y. 2006) (mere claim that appellate counsel failed to raise ineffective assistance of trial counsel because they were employed by the same public defenders' office was insufficient to suggest even an appearance of a conflict of interest).  Even if the claims that trial counsel was ineffective were not procedurally barred, they would be subject to denial on the merits as "patently frivolous" or clearly without merit, for the reasons set forth herein and in respondent's Memorandum of Law, at pages 19 through 23.  (Dkt. No. 11).

### c.   The Merits of the Claim

Petitioner's claim that trial counsel failed to put on a defense is utterly

---

[13] Petitioner has not claimed that appellate counsel's alleged ineffectiveness resulted from any conflict of interest arising from her professional affiliation from trial counsel.  As discussed below, there is no merit to petitioner's conclusory allegation that appellate counsel was ineffective in deciding which issues to raise on appeal.  *See Rivera v. Miller*, 05 Civ. 4048, 2006 WL 3230293, at *5 (S.D.N.Y. Nov. 7, 2006) (whether appellate attorney's employment at the same agency as the trial attorney created a conflict of interest is irrelevant where habeas petitioner did not show any adverse effect on his appellate counsel's performance).

inconsistent with the record.  Throughout the trial, counsel cogently presented the defense that the charged incident was non-sexual in nature, and that petitioner was simply trying to get D1 out of bed to do her chores.  (TT. 176-78, 378-82).  In his summation, counsel urged the jury to find that Inv. Ferrucci was responsible for putting a sexual "spin" on the incident.  (TT. 466).  He elicited on cross- examination (TT. 214) and argued in summation (TT. 468) that D1 did not suggest that the incident was a sexual assault until after meeting with Inv. Ferrucci.  Counsel further urged the jury to weigh the contradictory testimony of the investigator and petitioner with respect to the written confession, and to accept the petitioner's version because it was more in line with D1's testimony about the incident.  (TT. 478-79).  Throughout the trial, counsel put forth petitioner's strongest defense–that the charged incident was twisted out of context and mis-characterized as an attempted rape by the police.

As discussed above, petitioner's claims that his trial counsel failed to challenge the admission of the consensually recorded conversation with D1 or the evidence of prior, uncharged acts of sexual abuse, are also directly contradicted by the record.  The trial records also clearly contradicts petitioner's claim that trial counsel failed to advise the petitioner, that if he took the stand in his own defense, he would be subject to cross examination regarding the prior, uncharged, sexual abuse.  (TT. at 375-376).  Trial counsel objected to cross-examination of the petitioner about those prior uncharged crimes, but the prosecutor granted petitioner informal immunity from further prosecution.  (TT. at 375- 76).  After the court ruled that the petitioner would then be subject to cross-examination regarding the prior uncharged sexual misconduct,

defense counsel stated that he had explained to his client that he could not invoke the Fifth Amendment regarding the prior conduct if he were granted immunity.  (TT. at 376).  Counsel then consulted further with his client before the petitioner took the stand in his own defense.  (TT. at 376).

In short, petitioner's unfounded claims that his trial attorney's performance fell below an objective standard of reasonableness are patently frivolous and clearly unmeritorious.[14]  Furthermore, as noted above, petitioner could not establish prejudice even if there was some indication that trial counsel's performance was not reasonable. Given the strength of the case, there was clearly not a reasonable probability that the outcome of the trial would have been different.

## 2.    Claim of Ineffective Assistance of Appellate Counsel

The petitioner claims, in conclusory fashion, that his appellate counsel was ineffective in that she "merely filed a frivolous issue's [sic] that would not challenge [sic] issue's [sic] that had merit."  (Pet., Dkt. No. 1).  The only hint that petitioner provides with respect to how his appellate counsel was purportedly ineffective is that his motion to vacate in state court under § 440.10 criticized her for not challenging the sentencing judge's imposition of post-release supervision pursuant to N.Y. PENAL LAW § 70.45.  (Dkt. No. 12-7).

---

[14] As noted above, the lower courts in the Second Circuit have articulated two standards to determine whether a claim should be dismissed on the merits under 28 U.S.C. § 2254(b)(2), notwithstanding the failure to exhaust.  *See Hernandez v. Conway*, 485 F. Supp. at 273 n.1. Because the ineffective assistance claims would be subject to dismissal under either standard, this court does not need to resolve which competing standard should apply.

### a.   Exhaustion

In New York, a common law writ of error *coram nobis*, filed in the appellate court, is the proper vehicle for bringing a claim of ineffective assistance of appellate counsel.  *People v. Bachert*, 69 N.Y.2d 593, 598, 516 N.Y.S.2d 623, 626 (N.Y. 1987); *Turner v. Miller*, 124 Fed. Appx. 682, 683-684, 2005 WL 481694 (2d Cir. 2005).  By raising the issue of ineffective assistance of appellate counsel in a motion to vacate under N.Y. CRIM. PROC. LAW § 440.10, petitioner failed properly to exhaust his state remedies for this claim.  *See, e.g., Dumas v. Kelly*, 105 F. Supp. 2d 66, 74 (E.D.N.Y. 2000); *Bentley v. Scully*, 91 CIV. 1868, 1991 WL 183357, at *5 (S.D.N.Y. Sept. 11, 1991).

### b.   Procedural Default

There is no time limit under New York law for the filing of a writ of error *coram nobis*.  Thus, petitioner would have an opportunity to pursue his claim of ineffective assistance of appellate counsel by such a state writ, and this claim would not normally be procedurally defaulted.  *Id.*

In this case however, petitioner purported to raise, in a § 440.10 motion to vacate, the claim that his appellate attorney improperly failed to appeal on the issue of whether the imposition of post-release supervision on him was legal.  (Ex. G, Dkt. No. 12-7).  The motion was denied in state court under § 440.10(2)(c) because petitioner failed to raise the sentencing issue on direct appeal.  (Ex. I, Dkt. No. 12-9 at 3).  As noted above, denial of a motion to vacate under § 440.10(2)(c) can act as a procedural bar to a subsequent habeas claim, at least if the issue in question was of record and

could be raised on direct appeal.

Neither the Assistant District Attorney who opposed the motion (Ex. H, Dkt. No. 12-8), nor the court denying the motion (Ex. I) mentioned the apparent challenge to the effectiveness of appellate counsel for failing to raise the sentencing issue on direct appeal.  It would have made no sense to dismiss a claim that appellate counsel was ineffective for failing to raise an issue on appeal under § 440.10(2)(c) on the basis that she did not raise the issue on appeal.  If the court had recognized the claim of ineffective assistance of appellate counsel in the motion, the appropriate remedy would have been to dismiss it for lack of jurisdiction and direct the petitioner to pursue a writ of *coram nobis*.  *Bentley v. Scully*, 1991 WL 183357, at *5 (citing *Bachert*, 69 N.Y.2d at 596, 516 N.Y.S.2d at 624).  Accordingly, this court concludes that, even if the state court had dismissed a motion to vacate raising an issue of ineffective assistance of appellate counsel under § 440.10(2)(c), that would not constitute an "adequate" rule that was "firmly established and regularly followed by the state," and, thus would not support a procedural bar to a habeas claim.  *Garcia v. Lewis*, 188 F.3d at 77-78.[15]

### c.    The Merits of the Claim

Although the claim of ineffective assistance of appellate counsel is

---

[15] *Turner v. Senkowski*, 97-CV-653H, 2000 WL 575696, at *3-4 (W.D.N.Y. Feb. 17, 2000) held that a state court denial of a § 440.10 motion claiming ineffective assistance of **appellate** counsel (because that claim was not raised in prior § 440.10 motions) gave rise to a procedural bar to a habeas claim based on the same issue.  For the reasons stated, we do not agree that a § 440.10(2)(c) procedural bar under those circumstances would be adequate, and hence find this authority unpersuasive.

unexhausted, this court will recommend denial of the claim on the merits under 28

U.S.C. § 2254 (b)(2), because it is "patently frivolous" and clearly without merit.  As

noted above, the state trial judge who ruled on petitioner's motion to vacate did not

address the implied claim of ineffective assistance of counsel, and, in any event,

lacked jurisdiction to decide such a claim on the merits.  Accordingly, this court will

not view the denial of the § 440.10 motion as a decision on the merits of a claim of

ineffective assistance of appellate counsel, and will not apply the deferential standards

of 28 U.S.C. § 2254(d)(1) in addressing that claim here.

A defendant has the right to effective counsel on appeal, *Evitts v. Lucey*, 469

U.S. 387, 396-397 (1985), and the *Strickland* standard applies to claims of ineffective

assistance of appellate counsel.  *Aparicio v. Artuz*, 269 F.3d 78, 95 (2d Cir. 2001).  In

the appellate context, counsel is not required to advance every non-frivolous argument

that could be made.  *Aparicio*, 269 F.3d at 95 (citing *Evitts*, 469 U.S. at 394; *Jones v.

Barnes*, 463 U.S. 745, 75 (1983)).  "However, a petitioner may establish

constitutionally inadequate performance if he shows that counsel omitted significant

and obvious issues while pursuing issues that were clearly and significantly weaker."

*Clark v. Stinson*, 214 F.3d 315, 322 (2d Cir. 2000) (citing *Mayo v. Henderson*, 13 F.3d

528, 533 (2d Cir. 1994)).

The court must determine whether there is any merit to petitioner's conclusory

habeas claim that appellate counsel pursued frivolous issues on appeal and missed

significant and obvious issues.  Appellate counsel filed a cogent, 24-page brief

challenging petitioner's conviction and sentencing by contending that: (1) the trial

court abused its discretion in allowing the prosecution to introduce uncharged evidence of prior sexual contact between petitioner and his daughter; (2) the sentencing court improperly imposed a determinate, rather than indeterminate term of imprisonment for the attempted sexual abuse conviction; and (3) the overall sentence was unduly harsh, and should be reduced.  (Ex. B).  The prosecutor conceded that the second issue had merit (Ex. C at 8, Dkt. No. 12-3), and petitioner's sentence was modified on the sexual abuse charge.  (Ex. D at 1, Dkt. No. 12-4).  While appellate counsel did not succeed with the other arguments she raised, asserting these claims on appeal represented sound tactical choices, given the evidence in this case.

Other than the sentencing issue on which she prevailed, appellate counsel did not have any compelling issues to raise on appeal that promised a reasonable probability of securing a reversal or a significant reduction in petitioner's sentence. The habeas petition does not identify what other non-frivolous arguments petitioner believes appellate counsel should have raised on his behalf.  Petitioner's § 440.10 motion suggests that he believes that his appellate lawyer should have argued that the imposition of a term of post-release supervision was illegal.  As discussed below, that argument was clearly without merit in the circumstances of petitioner's case under New York State law.

Although petitioner never mentioned this in his claims of ineffective assistance, appellate counsel did not challenge the trial court's refusal to suppress defendants' confession or his statements in a consensually recorded telephone conversation with his daughter.  Appellate counsel clearly was aware of this issue, because her brief

33

extensively discussed the circumstances of these admissions and the litigation below concerning them.  (Ex. B at 6-10).  Given the well-established law applied to allow these statements in evidence, and the fact that the judge predicated his decision, in large part, on a credibility determination in favor of the police officer and against the petitioner (Ex. A, Dkt. No. 12-1), the decision not to pursue this claim on appeal is, again, a sound tactical decision.  *See, e.g.*, *People v. Booker*, 141 A.D.2d 925, 530 N.Y.S.2d 608 (3d Dept. 1988) (extraordinary circumstances are required to disturb the credibility judgment of the trier of fact in a *Huntley* hearing) (citing *People v. Jackson*, 101 A.D.2d 955, 956, 477 N.Y.S.2d 441, 443 (3d Dept. 1984) (factual determination of judge at Huntley hearing is to be accorded great deference); *People v. Yukl*, 25 N.Y.2d 585, 588, 307 N.Y.S.2d 857, 859 (N.Y. 1969)).

Appellate counsel also did not raise the effectiveness of trial counsel on appeal. However, petitioner did not even argue this issue on his motion to vacate in state court.  As noted above, the belated claims of ineffective assistance at trial in the habeas petition are completely at odds with the record.  Clearly, the issue of the effectiveness of trial counsel was not obviously stronger than the arguments counsel made on appeal.

There is absolutely no support in the record for petitioner's suggestion that his appellate counsel ignored any compelling issues on appeal in favor of frivolous arguments.   His conclusory claim that his appellate counsel was ineffective should be denied as frivolous and clearly without merit.  *See, e.g.*, *Reid v. Giambruno*, 03-CV-250, 2007 WL 3232497, at *9 (W.D.N.Y. Oct. 31, 2007) ("Strategic choices," such as

34

deciding which issues to raise on appeal, "made after thorough investigation of the law and facts . . . are virtually unchallengeable.") (quoting *Strickland*, 466 U.S. at 690-91); *Cabezudo v. Fischer*, 05-CV-3168, 2009 WL 4723743, at *12 & n.5 (E.D.N.Y. Dec. 1, 2009) (denying claim of ineffective assistance of appellate counsel where petitioner did not present any evidence indicating that counsel omitted significant and obvious issues, while pursuing clearly and significantly weaker arguments; conclusory statements are not cognizable as a basis for claims of ineffective assistance); *Thompson v. Lemke*, 08-cv-3426, 2009 WL 4110290, at *10 (E.D.N.Y. Nov. 23, 2009).

### 3.     Imposition of Term of Post-Release Supervision

In 1998, New York adopted "Jenna's Law," which abolished parole and instituted determinate terms of imprisonment for certain felony offenses. *People v. Williams*, 14 N.Y.3d 198, 206, 2010 WL 605257 (N.Y. 2010).  A major component of this statutory scheme required that every determinate sentence must also provide for post-release supervision ("PRS") under N.Y. PENAL LAW § 70.45.  *Id.*

Petitioner claims that the imposition of post-release supervision under N.Y. PENAL LAW § 70.45, as part of his sentence on the attempted rape charge, was illegal under New York law and unconstitutional under the 14th Amendment.  (Pet., Dkt. No. 1; Dkt. No. 13).  While petitioner's arguments are difficult to understand, he appears to contend that the imposition of a term 15 years of imprisonment and five years of PRS should both be viewed as part of a combined term of incarceration.  Petitioner apparently contends that this combined sentence would exceed the statutory maximum

(15-year) term of imprisonment for the attempted rape charge and would violate the Eighth Amendment.[16]

### a.    Exhaustion

In his motion to vacate his sentence under N.Y. CRIM. PROC. LAW §§ 440.10, petitioner challenged his sentence of PRS pursuant to N.Y. PENAL LAW § 70.45. Respondent's Memorandum of Law (at 16) argues that this motion failed to put the state court on notice of any federal or constitutional claim with respect to his term of PRS, and that, therefore, petitioner did not exhaust his state court remedies with respect to this claim.  (Dkt. No. 11).

"A habeas petitioner has a number of ways to fairly present a claim in state court without citing 'chapter and verse' of the Constitution, including '(a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation.'"  *Hernandez v. Conway*, 485 F. Supp. 2d 266, 273 (W.D.N.Y. 2007) (quoting *Daye v. Attorney General*, 696 F.2d 186, 194 (2d Cir.1982)).

In his § 440.10 motion, petitioner does not reference any federal statutory or constitutional provision in his challenge to the term of PRS imposed upon him. Petitioner did cite *People v. Catu*, a case which held that it was a due process violation

---

[16] Attempted rape in the first degree is a Class C violent felony, the maximum sentence for which is a determinate term of 15 years.  N.Y. PENAL LAW § 70.02(3)(b).

for a defendant to be sentenced to a term of PRS under N.Y. PENAL LAW § 70.45, if he had not been informed of that mandatory punishment prior to entering a guilty plea. *People v. Catu*, 4 N.Y.3d 242, 792 N.Y.S.2d 887 (N.Y. 2005).  While this case does employ constitutional analysis, it does not do so in a factual situation similar to the instant case because petitioner did not plead guilty, but was sentenced following a trial.[17]

Petitioner's motion includes the phrase "exceed the statutory limits of the Statute" at the end of a paragraph of otherwise irrelevant and/or incomprehensible prose.  (Dkt. No. 12-7 at 4, ¶ 3).  This phrase, in the appropriate context, might vaguely suggest his current theory that the terms of imprisonment and PRS, when combined, exceeded the statutory maximum term of imprisonment.   However, this random reference, without any hint of a connection to federal or constitutional law, was not sufficient to put the state court on notice of his current federal constitutional claim.  Hence, this court finds that the claim relating to petitioner's sentence of PRS is unexhausted.

### b.    Procedural Bar

The trial judge, without addressing the merits, denied petitioner's § 440.10 motion under § 440.10(2)(c) because he unjustifiably failed to raise the issue relating to his sentence of PRS on direct appeal.  (Ex. I, Dkt. No. 12-9).  If the § 440.10 motion were deemed to raise a constitutional challenge to his sentence, this would constitute a

---

[17] The issue in *Catu* was whether the defendant's plea could be a voluntary and intelligent choice among alternative courses of action when he was unaware of the post-release supervision.  4 N.Y.3d at 244-246, 797 N.Y.S.2d at 887-889.

procedural bar to that claim as part of a habeas petition.  However, as noted above, the § 440.10 motion did not fairly raise the federal/constitutional issue, so the denial of that motion should not give rise to a procedural bar to that habeas claim.  *See, e.g.*, *Carter v. Artuz*, 99-CV-4515, 2000 WL 863961, at *2 (E.D.N.Y. June 21, 2000) (because petitioner did not articulate an Eighth Amendment claim in challenging his sentencing on appeal, he faces no procedural bar under § 440.20).  Moreover, petitioner's collateral challenge to his sentence of PRS should have been brought, not under § 440.10, but under N.Y. CRIM. PROC. LAW § 440.20, which provides for motions to set aside sentences which are "unauthorized, illegally imposed, or otherwise invalid as a matter of law."  *See, e.g.*, *Brown v. Miller*, No. 97 CIV. 1874, 1998 WL 91081, at *2 (S.D.N.Y. Mar. 3, 1998) (the proper motion for relief from an unconstitutionally harsh sentence would in fact be one pursuant to § 440.20, not § 440.10); *Stauffer v. McGinnis*, No. 03-CV-6510, 2008 WL 3835468, at *7 (W.D.N.Y. August 13, 2008).  The trial court should have denied the motion, not under § 440.10(2)(c), but under § 440.10(2)(d) for failing to raise a challenge to the imposition of sentence under § 440.20.  *Stauffer v. McGinnis*, 2008 WL 3835468, at *7.

A motion to set aside a sentence under § 440.20, unlike a motion under § 440.10, may be brought despite petitioner's failure to raise the underlying claim concerning the sentence on direct appeal or in a prior motion.  *Mabery v. Keane*, 939 F. Supp. 193, 199 (E.D.N.Y. 1996) (citing *Levine v. Comm'r of Correctional Servs.*, 44 F.3d 121, 126 (2d Cir. 1995)).  *Cf.* N.Y. CRIM. PROC. LAW § 440.20(2) (motion

38

under this section must be denied when the same issues were previously **determined** on the merits on appeal) & § 440.20(3) (motion under this section may be denied when the same issues were previously **determined** on the merits upon a prior motion). Because there is no time limit for bringing motions under § 440.20, and because of the more limited statutory grounds for denial of such motions, petitioner would not be barred from raising a challenge to the imposition of PRS in a future motion under this section. *See, e.g.,Cuadrado v. Stinson*, 992 F. Supp. 685, 687 (S.D.N.Y. 1998); *Mabery v. Keane*, 939 F. Supp. at 199 (E.D.N.Y. 1996). *See also Levine v. Comm'r of Correctional Servs.*, 44 F.3d at 126 (assuming, but not deciding the issue).

In this case, the denial of challenge to an allegedly illegal sentence (which should have been brought under § 440.20) was incorrectly addressed under § 440.10 and denied for failure to raise that issue on appeal under § 440.10(2)(c). Under the circumstances, this court concludes that the denial would not constitute an "adequate" rule that was "firmly established and regularly followed by the state," and, thus would not support a procedural bar to a habeas claim, even if the § 440.10 motion properly articulated a constitutional challenge to petitioner's sentence. *Garcia v. Lewis*, 188 F.3d at 77-78. However, because petitioner's unexhausted claim regarding the imposition of PRS is frivolous, this court will not recommend dismissing this action so he can pursue a motion under § 440.20. This court, will, instead, address and recommend denying this habeas claim on the merits.

### c. The Merits of the Claim

In *People v. Williams*, the New York Court of appeals outlined the torturous

39

history of the implementation of mandatory post-release supervision ("PRS") under

"Jenna's Law."  *People v. Williams*, 14 N.Y.3d 198, 206-209, 2010 WL 605257 (N.Y.

2010).  At various times since 1998, when N.Y. PENAL LAW § 70.45 was adopted, the

imposition of mandatory PRS under that provision was declared illegal or

unconstitutional, as applied, because (1) defendants pleading guilty were not informed

of the mandatory PRS term prior to the plea[18]; (2) terms of PRS were imposed by state

correctional officials administratively, without an order of a court, where the

sentencing court had not imposed PRS as part of the sentence[19]; (3) courts attempted

to obviate the need to allow defendants who pled guilty without notice of the PRS

term to withdraw their pleas, by sentencing them to a combined term of prison and

PRS that did not exceed the statutory maximum term of imprisonment[20]; or (4)

defendants were re-sentenced by a judge to add the mandatory PRS term, but only

---

[18] *See People v. Catu*, 4 N.Y.3d 242, 792 N.Y.S.2d 887 (N.Y. 2005); *People v. Louree*, 8 N.Y.3d 541, 838 N.Y.S.2d 18 (N.Y. 2007); *People v. Boyd*, 12 N.Y.3d 390, 880 N.Y.S.2d 908 (N.Y. 2009).

[19] *See Earley v. Murray*, 451 F.3d 71 (2d Cir. 2006), *cert. denied sub nom. Burhlre v. Earley*, 551 U.S. 1159 (2007) (granting federal habeas relief to petitioner on whom term of PRS was imposed administratively by correctional officials); *Matter of Garner v. New York State Dept. of Correctional Servs.*, 10 N.Y.3d 358, 859 N.Y.S.2d 590 (N.Y. 2008) (only a judge may impose a PRS sentence); *People v. Sparber*, 10 N.Y.3d 457, 859 N.Y.S.2d 582 (N.Y. 2008).

[20] *See People v. Van Deusen*, 7 N.Y.3d 744, 819 N.Y.S.2d 854 (N.Y. 2006).  New York subsequently attempted to enact a legislative fix to obviate the need to allow defendants who pled guilty without notice of the PRS term to withdraw their pleas, by empowering a court to re-sentence them without a term of PRS, but only when the district attorney consented.  N.Y. CORRECT. LAW § 601-d (2008).  *People v. Williams*, 14 N.Y.3d 198, 208, 2010 WL 605257 examined constitutional problems with the application of § 601-d.

after they were released from their term of incarceration.[21]

Of the litany of problems relating to prior applications of N.Y. PENAL LAW § 70.45, none were present for this defendant.  He was convicted after trial and sentenced by the original sentencing court to the PRS term, after receiving proper advice about this aspect of the sentence.  (S.T. at 13-14).  It was never necessary for petitioner to be re-sentenced on the attempted rape charge, so he was never entitled to be considered for the imposition of a sentence without a term of PRS or with a reduction of the term of imprisonment or PRS to keep the combined total of both under the statutory maximum term of imprisonment.[22]

None of the cited cases discussing N.Y. PENAL LAW § 70.45 suggest any federal constitutional problems with the imposition of the mandatory term of PRS on the petitioner under the circumstances of his case, even though it was, like the term of

---

[21] *See People v. Williams*, 14 N.Y.3d 198, 206-209, 2010 WL 605257.  Subsequent appellate division cases have held that a defendant may legally be re-sentenced to a PRS term by a court, as long as PRS is imposed before the defendant is released from the initial term of imprisonment.  *See, e.g., People v. Murrell*, No. 2830, 5903/00, 2010 WL 1994815, at *1 (N.Y.A.D., 1st Dept. May 20, 2010); *People v. Becker*, No. 102281, 102630, 72 A.D.3d 1290, 2010 WL 1487991, at *1 (N.Y.A.D., 3d Dept. Apr. 15, 2010); *People v. Mendez*, No. 2008-09633, 3236/02, 2010 WL 1910072, at *1 (N.Y.A.D., 2d Dept. May 11, 2010); *People v. Scalercio*, 71 A.D.3d 1060, 896 N.Y.S.2d 872 (2d Dept. 2010); *People v. Prendergast*, 71 A.D.3d 1055, 896 N.Y.S.2d 875, 876 (2d Dept. 2010).

[22] *People v. Van Deusen*, 7 N.Y.3d 744, 819 N.Y.S.2d 854 disallowed the practice of re-sentencing defendants without imposing the mandatory term of PRS, which was followed for a time in an effort to avoid allowing such defendants to withdraw guilty pleas made without proper advice of the PRS term.  Petitioner's arguments in his reply papers are based, in part, on the lower court opinion in *Van Deusen*, which approved this practice.  (Dkt. No. 13-1 at 4; Ex. E, Dkt. No. 13-2 at 13).  [This citation to the record references the page numbers assigned by the CM-ECF system and printed on the header of the documents.]  Petitioner also seems to rely upon N.Y. CORRECT. LAW § 601-d, discussed in note 20 above, which would not apply to him because he was not convicted as a result of a guilty plea without proper notification of the mandatory PRS term.  (Dkt. No. 13 at 5; Ex. G, Dkt. No. 13-2 at 18).

imprisonment imposed, the maximum allowed by the applicable state criminal statute. *Cf. United States v. Wirth*, 250 F.3d 165, 170 n.3 (2d Cir. 2001) (it is well-settled that the punishment for a term of supervised release (on a federal conviction) may, when combined with the term of imprisonment for the underlying conviction, exceed the statutory maximum prison term for the underlying offense) (collecting cases).[23]  The Eighth Amendment forbids only extreme sentences which are "grossly disproportionate" to the crime of conviction.  *Lockyer v. Andrade*, 538 U.S. 63, 72-73 (2003).  The Second Circuit has consistently held that "[n]o federal constitutional issue is presented where . . . the sentence is within the range prescribed by state law." *White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992).  *See also Ewing v. California*, 538 U.S. 11, 25 (2003).  Petitioner's habeas claim relating to N.Y. PENAL LAW § 70.45 should be denied as frivolous or clearly without merit.

## C.   Certificate of Appealability

The court notes that an appeal from a final order in a habeas corpus proceeding under 28 U.S.C. § 2254 may only be taken upon the issuance of a certificate of appealability. 28 U.S.C. § 2253(c)(1)(A).  A certificate of appealability may be issued only if the applicant has made a substantial showing of a denial of a constitutional

---

[23] PRS, imposed under New York law, is similar to supervised release, imposed under federal law.  18 U.S.C. § 3583.  *See also United States v. McNeil*, 415 F.3d 273, 277 (2d Cir. 2005) (the imposition and revocation of federal supervised release do not raise any constitutional problems under *United States v. Booker*, 543 U.S. 220 (2005) and related cases); *United States. v. Huerta-Pimental*, 445 F.3d 1220, 1223-1224 (9th Cir. 2006) (imposition of term of supervised release as part of a sentence neither exposed defendant to additional punishment over the statutory maximum, nor required the court to engage in judicial fact-finding that might run afoul of *Apprendi v. New Jersey*, 530 U.S. 466 (2000) or its progeny)*; accord, United States v. Work*, 409 F.3d 484, 489-490 (1st Cir. 2005) (collecting cases).

right.  28 U.S.C. § 2253(c)(2).  *See Miller v. Cockrell*, 537 U.S. 322, 326 (2003).
Because this court has found that the claims raised by petitioner in this case do not
make a substantial showing of the denial of a constitutional right, the court will
recommend denial of a certificate of appealability.

WHEREFORE, based on the findings above, it is

RECOMMENDED, that the petition be DENIED and DISMISSED, and it is
further

RECOMMENDED, that a certificate of appealability be DENIED.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have
fourteen (14) days within which to file written objections to the foregoing report.
These objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT
TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE
APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993)(citing
*Small v. Secretary of HHS*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); FED.
R. CIV. P. 72.


Dated:  May 28, 2010


Hon. Andrew T. Baxter
U.S. Magistrate Judge